ISHEE, J„ for the Court:
¶ 1. In August 2010, Michael Ray Cochran shot and killed his wife. In 2011, Cochran pleaded guilty in the Leake County Circuit Court to deliberate-design murder and was sentenced to life in the custody of the Mississippi Department of Corrections (MDOC). Two years later, he filed a motion for post-conviction relief (PCR). In his PCR motion, Cochran alleged ineffective assistance of counsel and an involuntary guilty plea. After a hearing on the matter, the circuit court denied the PCR motion. Cochran now appeals. Finding no error, we affirm.
STATEMENT OF THE FACTS
¶ 2. In August 2010, Cochran shot and killed his wife of twenty-five years, Donna, in Leake County, Mississippi. The record reflects that Cochran and Donna began arguing over finances at their business — a horse-tack store that they owned and ran. Specifically, Donna allegedly told Cochran that she had taken $5,000 out of the horse-tack store to pay for their son’s wedding without consulting Cochran. After the argument became heated, Cochran claims, he stormed out of the building just as Donna threw a hammer at him. Cochran asserts that, upon hearing the hammer strike an area near the door and fall to the floor, he went back inside, pulled open a drawer with a pistol in it, and yelled at Donna to shoot him and use the insurance money to solve their financial problems. He admits that after Donna grabbed the gun and threw it at him, he picked it up and shot her in the head twice.
¶8. Cochran states that he left the horse-tack store, but returned later on and staged it to appear as if a robbery had occurred. Cochran disposed of the pistol later that day in his father-in-law’s chicken pit, and told the authorities he knew nothing about the incident. The homicide remained unsolved for approximately two months, until Cochran came forward and eventually confessed. He was then indicted for deliberate-design murder.
¶ 4. Throughout the proceedings, Cochran was privately represented by P. Shawn Harris. Harris states that he advised Cochran on numerous occasions that were he to plead guilty to murder, he would face a mandatory sentence of life imprisonment. Harris further informed Cochran that if he were to go to trial, he would have an opportunity to potentially reduce the crime to manslaughter or be found not guilty. Harris stated that Cochran repeatedly told him that he did not want to *645 put his family through the trauma of a trial and preferred to plead guilty to murder.
¶ 5. On April 26, 2011, Cochran attended a plea hearing. There, Cochran indicated that he wished to plead guilty to murder. The circuit judge questioned him extensively regarding his understanding of the consequences of pleading guilty and his alternatives to pleading guilty. Cochran maintained that he did not want to “put the family through a trial.” Concerned with Cochran’s decision to plead guilty to a crime carrying a mandatory life sentence, Harris also attached an addendum to the plea agreement, to become part of the permanent record. The addendum was signed by Cochran and notarized. In sum, Cochran agreed that he was aware that he would receive a mandatory life sentence for a plea to murder. He also acknowledged that Harris had offered to go to trial on the matter, had advised him that going to trial could produce a more favorable outcome, that pleading guilty to murder was not Cochran’s only option, and that he wanted to enter the guilty plea nonetheless. Having reviewed Cochran’s confession, the plea agreement, the addendum, and the dialogue with Cochran regarding the consequences of entering the plea, the circuit court accepted Cochran’s guilty plea and sentenced him to life in the custody of the MDOC.
¶ 6. In 2018, Cochran filed a PCR motion. He asserts that he received ineffective assistance of counsel during plea negotiations and that his guilty plea was improperly received by the circuit court. He claims that he requested a psychological evaluation, given his alleged mental instability, but that his attorney never made the request to the circuit court. Regardless, Cochran asserts that the circuit court should not have accepted his guilty plea as voluntarily or intelligently given due to his purportedly obvious mental incapacities at the time. According to Cochran, he entered a deep depression following the death of his wife, even considering suicide, and only confessed to authorities because he did not feel that he could mentally endure a trial for the crime of murder. Cochran claims he was not in a rational frame of mind when he confessed or when he pleaded guilty. He also alleges that the confession was the result of undue influence and coercion. After a hearing on the matter, the circuit court denied the PCR motion. Cochran now appeals.
DISCUSSION
¶ 7. In order for a defendant to prevail on an ineffective-assistance-of-counsel claim, he must “show by a preponderance of the evidence (1) that counsel’s performance was deficient, and (2) but for the deficiencies, the trial court outcome would have been different.” Jones v. State, 976 So.2d 407, 410-11 (¶ 6) (Miss.Ct.App.2008) (quotation marks omitted). Furthermore, under Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), a defendant must show “that counsel’s errors were so serious as to deprive the defendant of a fair trial.” Finally, “[a] presumption exists that the attorney’s conduct was adequate.” Hull v. State, 983 So.2d 331, 333-34 (¶ 11) (Miss.Ct.App.2007) (citing Bums v. State, 813 So.2d 668, 673 (¶ 14) (Miss.2001)).
¶ 8. Additionally, it has long been held that when reviewing the voluntariness of guilty pleas, an appellate court “will not set aside findings of a trial court sitting without a jury unless such findings are clearly erroneous.” Walton v. State, 16 So.3d 66, 70 (¶ 8) (Miss.Ct.App.2009) (quoting House v. State, 754 So.2d 1147, 1152 (¶ 24) (Miss.1999)). Furthermore, “[t]he burden of proving that a guilty plea was *646 involuntary is on the defendant and must be proven by a preponderance of the evidence.” Id. (citation omitted).
¶ 9. Here, Cochran claims that he requested a psychological evaluation but that Harris never requested one from the circuit court. Cochran’s only evidence in support of this assertion is his own testimony. Both Cochran and Harris testified at the hearing on Cochran’s PCR motion. Harris stated that Cochran only asked for grief counseling, not for a psychiatric evaluation. He also said that Cochran was not incompetent. Specifically, Harris said: “Being emotionally upset is one matter; having a psychiatric problem that causes a problem with our relationship is another; and he exhibited no signs of that.” Cochran testified that during their meetings, Cochran was able to communicate logically, understood the nature of the proceedings against him, and understood the charges and them consequences. Harris received no indication from any family members that there was a history of mental illness or that Cochran was exhibiting mental illness at the time of his conversations with Harris.
¶ 10. Furthermore, Harris stated that Cochran assisted him in defending the ease. In fact, Harris testified that Cochran’s initial goal was to see if Harris could procure a plea bargain for him to plead guilty to manslaughter instead of murder. Although Harris attempted to engage the prosecution in plea negotiations, he could not obtain an offer to reduce the crime charged to manslaughter. Cochran stated that the night before the plea hearing, Harris met with him and told him the prosecution refused to offer a plea bargain for manslaughter. Cochran agreed that Harris informed him that his only option other than pleading guilty to murder was to go to trial, but he claims Harris said that Cochran would likely be convicted of murder even in a trial. Cochran then said: “[T]he state of mind I was in, I just didn’t — I didn’t want to put my children through a trial.... I had done put enough on them.”
¶ 11. Harris disputed Cochran’s assertion that he advised Cochran that he would be convicted of murder even at trial. Specifically, Harris testified:
[W]hen it was apparent that [the prosecution] was not going to [offer a manslaughter plea], that the only offer we were going to get from the D.A. was a murder conviction, which would carry life in prison, I told him that, you know, you understand you’re pleading to the maximum[;] because at this point in time I had never had anyone plead to the maximum on a case like this either. And I explained to him that you’re pleading to the maximum, you’re pleading to your worst possible outcome. We could go to trial; and if you go to trial, you have the right to have a manslaughter instruction offeredf.] ... It would be up to the [c]ourt to grant it. It would be up to the jury to believe it, but no one could stop him from offering a manslaughter instruction. But that would be the only way that’s going to happen. And just like he had on numerous occasions before, [he] said he was not going to put his children and family through that.
[[Image here]]
[F]rom the very beginning it was about his family and his children. He didn’t want to drag them through a trial where he felt like in the end, he would just still be found guilty of murder.
¶ 12. Prior to the circuit judge accepting Cochran’s guilty plea, the same types of questions were asked extensively to Cochran regarding his understanding of his plea, the consequences surrounding his plea, and the alternatives available to him. *647 Cochran stated that he understood. Then, the following dialogue ensued:
The Court: You swore to this petition. Are all things set forth in that petition true and correct?
Cochran: Yes, sir.
The Court: Is there any part of it that would need to be changed at this time or corrected or amended?
Cochran: No, sir.
The Court: Now, Michael Ray Cochran, the penalty for the crime of murder, there’s only one penalty followed by law. I do not have the discretion to sentence you to a day more or a day less. That’s life imprisonment. You’re pleading to life imprisonment. Do you understand that?
Cochran: Yes, sir.
The Court: Why?
Cochran: I did what I did.
The Court: Speak up.
Cochran: I just don’t want to put everybody through a trial.
The Court: You’re charged with murdering your wife, are you not?
Cochran: Yes, sir.
The Court: Are you guilty of that crime?
Cochran: Yes, Sir.
The Court: Are you telling me that you murdered your wife?
Cochran: I killed her.
The Court: You killed her?
Cochran: Yes, sir.
¶ 13. In denying Cochran’s PCR motion, the circuit judge noted the following:
The final decision of whether or not to go to trial is a decision that cannot be made by counsel. Counsel’s client has to make that decision. Cochran entered a plea of guilty with a full understanding of his rights. [He] appeared very relaxed when he appeared before me for sentencing and I was convinced that he knew what he was doing.
¶ 14. Moreover, prior to accepting Cochran’s guilty plea, the circuit judge asked Cochran numerous times and in several different ways if he was satisfied with Harris’s performance. On each occasion, Cochran responded that he was satisfied and had no complaints with Harris’s performance. Additionally, in the plea addendum signed by Cochran and notarized and filed with the circuit court, Cochran stated the following:
1. I understand that I am voluntarily entering my plea of guilty to the crime of murder.
2. I understand that there is only one penalty for the crime of murder and that is life in prison.
3. I understand that my attorney has advised me that I do not have to plead guilty to murder, but it is my own decision to do so.
4. I understand that I am pleading guilty and will receive a recommendation of [m]urder, for which there is only one penalty, life in prison[,] and that will be the recommendation of the district attorney[,] and I will not receive a recommendation for manslaughter. Further, I understand that the [j]udge has no discretion in my sentence and when I enter my plea I will receive life in prison.
5. I understand that ... my attorney has advised me that if I were to go to trial, I could have [the] opportunity to try to get the [c]ourt to issue a manslaughter instruction, or be found not guilty, but there will be no chance of manslaughter at a plea of guilty to [m]urder.
6. I understand that my attorney has advised me that he can be prepared *648 for a trial, and will try my ease if that is what I want to do.
7. I understand that I am entitled to an attorney to try my case[,] and I do not have to plead guilty to this crime and I could go to trial. At that trial, I might have an outcome that is better than life in prison.
8. I understand that currently, I will not be eligible to be released from custody until I [reach] age 65 or [serve] 15 years, whichever is greater, and at that time I can petition the circuit court that sentenced me to commute the rest of my sentence. I am not entitled to parole.
9. I understand all of the above, but I still want to enter a plea of guilty[,] and I do not want my case to go to a trial. I also agree and affirm that no one has tried to convince me to do this, and I am doing it of my own free will.
¶ 15. Cochran bases his entire argument regarding his mental instability on his assertion that he requested a mental evaluation and that no competent defendant would plead guilty to murder instead of going to trial. We disagree. The circuit court was correct in noting that a counsel’s client must make the ultimate decision as to whether or not to go to trial. The record indicates that while Cochran may have been grieving over the loss of his wife, he was not incompetent to enter a plea of guilty to murder. The record is full of Cochran’s steadfast desire to not put his family through a trial. Each time Cochran was asked why he was pleading guilty instead of going to trial, he consistently stated that he wanted to protect his family. We cannot say that this decision reflects a mental incapacity.
¶ 16. Furthermore, there is no indication in the record that he ever exhibited signs of confusion or misunderstanding. He showed no signs of erratic behavior or any behavioral evidence of a mental problem at all. Both Harris and the circuit judge stated that their observations and interactions with Cochran led them to believe that he was fully capable of making decisions on his own behalf. Additionally, the only evidence Cochran offers to support his contention that he requested a mental evaluation is his own statement, which Harris strongly denies. This is not sufficient to prove that the request was actually made or that Harris’s performance was deficient. Moreover, we cannot find any evidence that Cochran exhibited signs of mental instability such that Harris or the circuit judge should have ordered a mental evaluation sua sponte. While Cochran may have experienced grief, we agree with Harris that there is a difference between grief and mental incapacity. Harris did not provide ineffective assistance of counsel by failing to garner a mental evaluation for Cochran or by allowing him to enter a guilty plea to murder. This issue is meritless.
¶ 17. Finally, Cochran’s assertion that his guilty plea was involuntary is misplaced. He was certainly apprised of the consequences of pleading guilty to murder and the available alternatives to pleading guilty. As noted above, he signed not one, but two documents admitting his understanding of every aspect of his plea and admitting that he committed the murder. He also admitted under oath that he fully understood the consequences of pleading guilty, that he did, in fact, murder his wife, and that he was satisfied with Harris’s representation of him throughout the proceedings. As stated previously, Harris and the circuit judge questioned Cochran at length regarding his understanding of the consequences of and alternatives to pleading guilty. Neither Harris nor the circuit judge could force Cochran to go to *649 trial. Each time Cochran was questioned by either Harris or the circuit judge as to why he was entering a guilty plea, Cochran maintained that he did not want to put his family through the hardship of a trial. The record indicates that he was fully aware of the circumstances surrounding his guilty plea, and entered the plea nonetheless. While unconventional, it was not involuntary. This issue is also without merit.
¶ 18. THE JUDGMENT OF THE LEAKE COUNTY CIRCUIT COURT DENYING THE MOTION FOR POST-CONVICTION RELIEF IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, ROBERTS, CARLTON, MAXWELL, FAIR AND JAMES, JJ., CONCUR.